1  ANNE MARIE MURPHY (SBN 202540)
   amurphy@cpmlegal.com
2  SAMUEL GUTIN (SBN 324436)
   sgutin@cpmlegal.com
3  COTCHETT, PITRE & McCARTHY, LLP
4  840 Malcolm Road
   Burlingame, California 94010
5  Telephone: (650) 697-6000

6  CARLOS URZUA (SBN 303176)
   curzua@cpmlegal.com
7  KALI V. FOURNIER (SBN 320579)
   kfournier@cpmlegal.com
8  COTCHETT, PITRE & McCARTHY, LLP
9  2716 Ocean Park Blvd Suite 3088
   Santa Monica, CA 90405
10 Telephone: (310) 392-2008

11 *Attorneys for Plaintiff*

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

**DEC 23 2020**

BY _____
NICOLE CARTWRIGHT, DEPUTY

12           SUPERIOR COURT OF THE STATE OF CALIFORNIA
13              IN AND FOR THE COUNTY OF SAN BERNADINO

14

15 **CYNTHIA CARRILLO,** individually and as
16 heir of **DAVID CARRILLO**, deceased,

17              Plaintiff,

18       v.

19 **VILLA MESA CARE CENTER,**
   a/k/a **San Antonio Post Acute Facility;**
20
21 and,

22 **DOES 1-50.**

23              Defendants.

24

25

26

27

28

**Case No.**  CIV SB  2 0 27 17 2

**COMPLAINT:**

1. **VIOLATIONS OF THE ELDER AND
   DEPENDENT ADULT CIVIL
   PROTECTION ACT** (Welfare &
   Institutions Code §15600 *et seq.*)

2. **NEGLIGENCE**

3. **WRONGFUL DEATH**

4. **VIOLATION OF RESIDENT
   RIGHTS** (Health & Safety Code
   §1430(b))

**JURY TRIAL DEMANDED**

**COMPLAINT**

## TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION .................................................................................................1

II.   JURISDICTION AND VENUE .........................................................................3

III.  PARTIES .............................................................................................................3

      A. Plaintiff ........................................................................................................3

      B. Defendant VMCC .........................................................................................4

      C. Doe Defendants ............................................................................................4

IV.   AGENCY/JOINT VENTURE/AIDING AND ABETTING/CONSPIRACY .............4

V.    STANDING TO BRING THIS SURVIVAL ACTION .................................5

VI.   FACTUAL BACKGROUND ..............................................................................5

      A. The Background of VMCC ..........................................................................6

      B. David Enters VMCC for Temporary Care ..................................................8

      C. COVID-19 Takes Hold at VMCC and David Dies ...................................10

VII.  CAUSES OF ACTION .....................................................................................13

      FIRST CAUSE OF ACTION
      ELDER AND DEPENDENT ADULT ABUSE AND NEGLECT UNDER THE ELDER
      ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT ..............................13

      SECOND CAUSE OF ACTION
      NEGLIGENCE ........................................................................................................14

      THIRD CAUSE OF ACTION
      WRONGFUL DEATH .............................................................................................16

      FOURTH CAUSE OF ACTION ...........................................................................18
      VIOLATION OF CALIFORNIA HEALTH AND SAFETY CODE
      SECTION 1430(b) ..................................................................................................18

VIII. PRAYER FOR RELIEF ...................................................................................19

Plaintiff **CYNTHIA CARRILLO** ("Cynthia" or "Ms.  Carrillo"), individually and as heir and successor-in-interest of **DAVID CARRILLO** ("Mr.  Carrillo" or "David"), deceased, brings this action for damages against defendant **VILLA MESA CARE CENTER, a/k/a San Antonio Post Acute Facility** ("Defendant") or ("VMCC").

## I. <u>INTRODUCTION</u>

1.     Nursing homes and skilled care facilities are supposed to play an essential role in providing much needed care to elderly Americans and dependent adults.  They are entrusted with highly vulnerable individuals who often have multiple physical and cognitive impairments, and who require extensive assistance in the basic activities of daily living, such as dressing, feeding, and bathing.



(Source: Family picture of Mr. David Carrillo from 2017)

2.      This action seeks redress for the preventable death of sixty-five-year-old David Carrillo.  David was born with Down syndrome and was non-verbal.  In the last months of his life, he was treated for anxiety and the onset of dementia.  Because of this, he was especially helpless and vulnerable in advocating for himself while under the full-time care of Defendant.  Unfortunately, his treatment at VMCC was lacking in both dignity and respect.

3.      This case involves an avoidable outbreak of COVID-19 among the most vulnerable of populations: residents of a skilled care facility.  As of April 24, 2020, twenty-four (24) residents in a ninety-nine (99) bed facility had contracted the virus, not including the four (4) staff members who also contracted COVID-19.  At least three (3) residents died from COVID-19 in Defendant's facility.  David's surviving sister intends to uncover how COVID-19 was allowed to rage through VMCC.[1]

4.      David did not die due to an unavoidable act-of-god, rather, he lost his life because VMCC failed to follow protective procedures and skirted safety and infection controls as set forth below.  VMCC also had a history of treating David without dignity or respect.

5.      David lived with his sister, Cynthia, up until December 2019, when he entered VMCC following a hospitalization.  She visited her brother daily (and sometimes multiple times per day) until VMCC stopped allowing visitors in early March of 2020.  Even then, Cynthia continued to visit her brother through a window.

6.      Cynthia watched with distress as her brother's condition rapidly declined.  When living with Cynthia, David was ambulatory—although he did have some trouble with stairs due to anxiety.  At VMCC David was placed in a wheelchair and kept there.  In addition, when living with Cynthia, David used a spoon and fork to eat, but at VMCC, David rapidly deteriorated.  David could no longer use a fork and spoon nor reliably swallow his food.

7.      On April 9, 2020, Cynthia was stunned when she received a call at 1:00 a.m. from San Antonio Regional Hospital stating that David was in the Hospital's care.  They told Cynthia that David was in respiratory distress.

---

[1] Venturi, *Seven County Nursing Homes Have Sustained Multiple Confirmed Coronavirus Fatalities*, San Bernardino County Sentinel (April 24, 2020), http://sbcsentinel.com/2020/04/seven-county-care-homes-have-multiple-cornoavirus-death/

8.  Bewildered Cynthia called VMCC to make sure the Hospital was talking about the right person.  VMCC told Cynthia that VMCC had called emergency services because David was in respiratory arrest and that he could not breathe.  VMCC's excuse for not calling Cynthia to tell her about her brother's change in condition or imminent hospitalization was that they were busy taking patients' temperatures.

9.  David was admitted with acute respiratory failure and severe hypoxemia.  The Hospital promptly diagnosed David as COVID positive.  Having contracted COVID-19 at VMCC, David died from COVID-19 on April 17, 2020.

## II.  JURISDICTION AND VENUE

10.  Venue is proper in this County because Defendant is located and/or performs business in this County, and a substantial part of the events, acts, omissions, and transactions complained of herein occurred in this County.  Defendant, VMCC, is located at 867 East 11th Street, Upland, CA 91786.

11.  Each Defendant has sufficient minimum contacts with California, and has purposely availed itself of benefits and protections of California, and does business in California so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

12.  The amount in controversy exceeds the jurisdictional minimum of this Court.

## III.  PARTIES

### A.  Plaintiff

13.  Plaintiff Cynthia Carrillo is, and at all times herein mentioned was, the sister, successor-in-interest and heir of the decedent, David Carrillo.  Cynthia was actively involved in her brother's care and visited David frequently when he was at VMCC.  Cynthia is lawfully entitled to pursue all claims and causes of actions for damages pursuant to Code of Civil Procedure Sections 377.32, 377.60, 377.71, Welfare and Institution Code Section 15657.3(d), and Probate Code Section 48.  *See* **Exhibit A.**

---

**COMPLAINT**                                                                                     3

**B.**   **Defendant VMCC**



(Source: Photo of VMCC Via the Daily Bulletin)

14.   Villa Mesa Care Center a/k/a San Antonio Post Acute Facility was, at all times relevant herein, a Skilled Nursing Facility ("SNF") which provides services at 867 East 11th Street, Upland, CA 91786, which is also its principal place of business.

**C.**   **Doe Defendants**

15.   Plaintiff is ignorant of the names of those Defendants sued as DOES 1 through 50 and for that reason has sued DOE Defendants by fictitious names.  Plaintiff further alleges that each of said fictitious DOE Defendants is in some manner responsible for the acts and occurrences hereinafter set forth.  Plaintiff will seek leave of the court to amend this Complaint to show their true names and capacities when the DOE Defendants are ascertained, as well as the manner in which each fictitious Defendant is responsible for the damages sustained by Plaintiff.

**IV.   AGENCY/JOINT VENTURE/AIDING AND ABETTING/CONSPIRACY**

16.   Plaintiff is informed and believes, and upon such basis alleges, that at all times herein mentioned, each of the Defendants, including those named as DOE Defendants, herein was an agent, servant, employee and/or joint venturer of each of the remaining Defendants, and was at all times acting within the course and scope of said agency, service, employment, and/or joint venture.

17.     Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance in accomplishing the wrongful conduct and their wrongful goals and other wrongdoing complained of herein.  In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of his/her primary wrongdoing and realized that his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

18.     Defendants, and each of them, conspired with each other and with others, to perpetrate the unlawful scheme on Plaintiff, as alleged in this Complaint.  In so doing, each of the Defendants have performed acts and/or made statements in furtherance of the said conspiracy, while at all times acting within the scope of and in furtherance of the conspiracy alleged in this Complaint, and with full knowledge of the goals of that conspiracy.

**V.     STANDING TO BRING THIS SURVIVAL ACTION**

19.     Pursuant to the provisions of Code of Civil Procedure Section 377.32 and Welfare Institutions Code Section 15657.3(d), Plaintiff Cynthia Carrillo, as successor-in-interest to decedent David Carrillo, is lawfully entitled to pursue all survival claims and causes of action for damages on behalf of decedent David Carrillo.

20.     Additionally, pursuant to the provisions of Welfare and Institutions Code Section 15657.3(d) and Section 48 of the Probate Code, Plaintiff is an interested person, as defined by Section 48 of the Probate Code, and is thus lawfully entitled to pursue all claims and causes of action in a survival action on behalf of decedent David Carrillo.

**VI.   FACTUAL BACKGROUND**

21.     The physical abuse or neglect of a dependent adult is one of the most egregious violations that can occur in SNFs.  The disabled residents of SNFs cannot protect themselves from physical harm, and sometimes cannot even communicate that they have been subjected to physical abuse.  Dependent adults residing in SNFs are often entirely dependent upon nursing homes to ensure their safety.

22.     One such adult was sixty-five-year-old David Carrillo, who died of COVID-19. He was a resident of VMCC, which is in Upland, California (867 East 11th Street, Upland, CA 91786).  David had lived with his sister, Cynthia Carrillo, and her husband, at their home in Upland through December 2019.

23.     David originally moved in with Cynthia after their father died in 2012.  For twenty-three years, David attended Lincoln Training Center in South El Monte, where he put together packages of airplane parts, toys, and other products.  Before entering VMCC, David attended First Steps in Montclair, California, a day program where David had many friends. David, though non-verbal, was visually communicative and able to say the word "bonita," which means beautiful in Spanish, to his sister.

24.     David, who had Down syndrome, was placed in VMCC for what was supposed to be a temporary stay, on December 28, 2019.  In fact, a day before VMCC was "locked down" due to COVID-19, David was set to go to a group home in Ontario, California.

25.     David was an active individual, sleeping only four hours every night yet still filled with energy.  Cynthia recalls him being "like a little energizer bunny."  He was able to, and did, walk all around the upstairs of their home. After entering VMCC, Cynthia never saw David walk again.  Cynthia also knew David to have a significant appetite.  Yet, after entering VMCC, David appeared to lose weight and had trouble even swallowing his food.

26.     Cynthia took significant care of David.  She groomed him, fed him, and changed his clothes both before he entered VMCC and after.  David, who was able to go to the bathroom on his own when living with Cynthia, wore a diaper that he rarely soiled.  After moving into VMCC, Cynthia found David's diaper soiled repeatedly.

**A.    The Background of VMCC**

27.     While SNFs are expected to keep their residents safe from harm, the truth is that abuse and neglect in such facilities has become a problem throughout the nation and the State of California.  VMCC has a history of providing sub-standard care.  In 2020, the facility had thirty-three (33) complaints reported, compared to the statewide average of only thirteen (13).

---

1    In 2019, they had thirty (30) deficiencies reported, compared to the statewide average of only

2    twenty-two (22).[2]

3          28.    Seventeen (17) of the reported deficiencies from 2019 came in the fourth quarter

4    alone.  Among the deficiencies were issues of physically restraining patients when it was not

5    necessary, failure to timely report allegations of abuse, neglect, exploitation, or mistreatment,

6    and failure to change visibly soiled gastric tubing for up to seven days.[3]  The deficiency

7    involving the gastric tubing, for example, was cited as an "infection prevention and control"

8    deficiency.

9          29.    Under the circumstances that prevailed at VMCC pre-COVID-19, it was

10   inevitable that the nursing home would be ravaged by COVID-19.  This is supported by a GAO

11   study dated May 20, 2020, which described the prevalence of infection prevention and control

12   deficiencies in nursing homes prior to the COVID-19 pandemic and the correlation between

13   facilities with deficiencies in 2018 to 2019 and current COVID-19 outbreaks.[4]

14         30.    According to Medicare.gov, VMCC severely understaffed Registered Nurses

15   ("RN") to a level that was "much below average."  In terms of RN hours per residents per day,

16   VMCC only had eighteen (18) minutes of RN time per resident, per day. For comparison

17   purposes, the average SNF nationwide has forty-five (45) minutes of RN time per resident per

18   day.[5]

19

20

21

22   _____

23   [2] California Department of Public Health
     (https://www.cdph.ca.gov/Programs/CHCQ/LCP/CalHealthFind/Pages/SearchResult.aspx (last
24   visited November 13, 2020).
     [3] California Department of Public Health
25   (https://www.cdph.ca.gov/Programs/CHCQ/LCP/CalHealthFind/Pages/ASPEN_FEDERAL_2
     567.aspx?EventID=772R11) (last visited November 13, 2020).
26   [4] *Infection Control Deficiencies Were Widespread and Persistent in Nursing Homes Prior to
     COVID-19 Pandemic*, GAO-20-576R: Published: May 20, 2020 (accessible at
27   https://www.gao.gov/assets/710/707069.pdf).
     [5] Medicare.gov
28   (https://www.medicare.gov/nursinghomecompare/profile.htm1#proftab=3&ID=056136) (last
     visited November 13, 2020).

31.     As noted by a leading UCSF study, "[m]any California studies have demonstrated that serious quality of care problems have been associated with inadequate staffing levels, and most importantly, low RN staffing."[6]

### B.     David Enters VMCC for Temporary Care

32.     David went to VMCC on December 28, 2019, after leaving San Antonio Regional Hospital.  Cynthia had taken David to the hospital due to his agitated state and severe onset of anxiety.  At the hospital, she was informed that David was suffering from the early onset of dementia.

33.     David's anxiety had prevented him from using stairs.  Cynthia chose to place David in VMCC's care while she and her husband searched for a long-term care facility or a single-story home.  Physically, he was capable of walking up and down stairs, but the severe anxiety was preventing him from leaving the top floor of the family home.  He took Ativan daily for his anxiety.

34.     After David entered VMCC, Cynthia visited daily.  Sometimes, she visited both before and after she went to work at Charter Oak Day School in Covina, California.

35.     The first instance of concern took place in early January, after David had been living at VMCC for two weeks, when Cynthia came in one morning to attend to David.  She was startled when she found David on a reclining chair, unresponsive to her.  She immediately found a nurse to ask what was wrong and was told that David was "just tired."  She asked if her brother had been given any drugs and was specifically told he had not been given drugs.  However, after pressing further, staff admitted that VMCC had given David Seroquel.

36.     Cynthia had not given permission for the use of Seroquel and had specifically chosen not to use the drug with David when he had lived with her.  Cynthia was upset to learn that he was on Seroquel without her permission.

37.     When David entered VMCC in December 2019 he was perfectly able to walk on his own.  However, at VMCC Cynthia often found her brother strapped into a wheelchair or laying in his bed.  After entering VMCC, she never saw David walk again.

---

[6] "*California Nursing Home Chains by Ownership Type Facility and Resident Characteristics, Staffing, and Quality Outcomes in 2015*" UCSF, Dr.  Charlene Harrington and Dr.  Leslie Ross.

38.     When Cynthia inquired about the amount of exercise David was receiving, she was told that David takes twenty steps per day, as part of his physical therapy program.  This was exceedingly concerning to Cynthia as David had been active before entering VMCC and was fully capable of walking around the Carrillo home.

39.     One morning in early February Cynthia found David strapped to a wheelchair and again barely responsive, as he had been during a visit in January.  Cynthia asked if VMCC was using Seroquel on David, but the nurse denied the use of the drug.  Cynthia was concerned because she could not get David to eat anything, which was unusual for David.  David was losing weight and regressing physically and mentally.

40.     While living with Cynthia, David had always been able to use a fork or spoon to feed himself, although food needed to be pureed.  However, after entering VMCC, David declined to the point where he was unable to use a fork or spoon.  Cynthia used her visits to assist in feeding David.

41.     On multiple occasions Cynthia had to ensure that VMCC fed David the right food, because he had no teeth and could not eat hard foods.  Cynthia observed that VMCC repeatedly gave David the wrong meals for breakfast and dinner; including food that required significant chewing.  Cynthia time and again called staff members to have the food pureed and brought back.  Cynthia was concerned that David was not eating or being fed food he could eat during meals that she did not monitor, especially when she was working during lunch.  David appeared to be losing weight.

42.     On one occasion, a member of the nursing staff told Cynthia that David needed to learn how to feed himself.  On another occasion, Cynthia received three different answers when she inquired as to how much lunch David had eaten.  She was told "100%" by one staff member, "20%" by a second staff member, and that he ate "none" of his food by a third staff member.

43.     In early February, Cynthia informed VMCC's staff that there was a rash on David's leg as well as a cut on his ear.  She was not given any explanation for how these

1    injuries occurred.  It was upsetting that Cynthia was in the position of discovering and

2    reporting injuries and conditions to VMCC.

3        44.    Multiple times Cynthia discovered that David had soiled diapers at VMCC and

4    had to request that staff attend to his soiled diaper.  This was distressing to Cynthia because

5    when David lived at home with Cynthia, he was able to toilet himself.  While he wore diapers

6    as a precaution, it was rare that David would not make it to the toilet in time when living at

7    home.

8        45.    Also alarming to Cynthia was the repeated occurrence of David wearing the exact

9    same clothes on consecutive days.  Cynthia had to repeatedly ask the staff at VMCC to wash

10   David and change his clothes.  Staff would claim that they had changed David's clothes but

11   Cynthia (who visited daily and took David's clothes home to launder) knew this was untrue.

12       46.    Eventually the staff at VMCC started dressing David in gowns only.  Cynthia,

13   concerned that this was a tactic to create the appearance that David had been changed, took

14   note of the stains upon the gowns.  Even then, she realized that the gowns were being used

15   multiple days in a row.  In short, Cynthia was disturbed by the lack of dignity and respect

16   shown to David.

17       47.    Cynthia was also troubled by the staffing at VMCC.  She noted that there were

18   few RNs, as opposed to certified nurse's assistants at the facility.  Cynthia only saw David's

19   doctor one time.

20       **C.**    **COVID-19 Takes Hold at VMCC and David Dies**

21       48.    In or about January 2020, the first cases of COVID-19 reached the United States.

22       49.    Around March 12, 2020, Cynthia, and other relatives of VMCC residents were

23   told that they were no longer allowed to enter the facility to visit their loved ones.

24       50.    Cynthia called daily to inquire about David's condition and status.  She needed to

25   make sure that her brother was being cared for now that she was unable to see him in person.

26       51.    During one of these phone calls, Cynthia was told that the staff would be

27   allowing visitations by appointment through the windows of the patients' rooms.

28

52.     On March 30, 2020, she went to visit David through the window.  When passing the main entrance, she saw that there were signs on the door stating that no one was to enter without wearing a mask.  Cynthia witnessed a pregnant staff member sitting just behind the closed doors, not wearing a mask.

53.     David was rolled into the lobby to visit her and she witnessed the staff in the room with David not wearing masks.

54.      One of the mask-less staff members called Cynthia with her personal cell phone and handed the phone to David so that Cynthia could speak to him.  The staff member held her personal cell phone to David's face while Cynthia spoke to him.

55.     Cynthia noted that David did not look well.  This was the first time she had seen David in a few weeks, and it looked as though he had regressed even further.

56.     David was also wearing someone else's clothes.  David, being non-verbal, was unable to protest.

57.     Cynthia contacted Ivan, the infection control nurse at VMCC and asked Ivan why the staff were not wearing masks—Ivan told Cynthia that masks were not essential.

58.     Per nursing home records provided after David's death, on April 6, 2020, David started to develop redness around his groin area, indicating that he was not being changed or being cleaned properly.

59.     At 1:00 AM on April 9, 2020, Cynthia got a call from San Antonio Regional Hospital stating that her brother had been transported there by emergency services.  The hospital noted that he was in severe acute respiratory distress.  David was administered a COVID-19 test.

60.     Cynthia's husband, Armando, was able to speak with the emergency room doctor.  The Doctor told Armando that David was very sick.

61.     On April 10, 2020, the hospital informed Cynthia that David was positive for COVID-19.

62.     Cynthia did not learn that her brother's condition was deteriorating from VMCC, as she should have.  Instead, she was awoken in the middle of the night with the disturbing

**COMPLAINT**                                                                                          11

news that her brother was already in the hospital's care.  Cynthia had not been told that David was having any breathing problems or fever prior to the surprise phone call from the hospital.

63.   On April 10, 2020, the team at San Antonio Regional Hospital documented injuries to David's ankle and lower back that had not been disclosed to Cynthia.  He had erythema (reddening) to his sacrum and left ankle.  In addition to the injuries to David's sacrum and left ankle, David had a cut on his right ear.  He had a catheter placed into his penis, which appeared to be significantly swollen and red.

64.   Cynthia's only contact with David during this time was through FaceTime, in the moments that he was conscious.

65.   Cynthia inquired with a member of VMCC's staff about David's condition leading up to his hospitalization.  The staff member reported that in the days leading up to his hospitalization, David was not looking well and that multiple staff members had told the head nurse that David needed to see a doctor.  She informed Cynthia that the head nurse did not act on those recommendations.

66.   On April 17, 2020, David died from COVID-19.

67.   On April 18, 2020, Cynthia went to VMCC at the request of one of the staff members she was friendly with.  From her car she saw that staff members inside of VMCC were not wearing masks.

68.   Lana Culp, the public health spokesperson for San Bernardino County Public Health Department, told the San Gabriel Valley Tribune around April 19, 2020, that Villa Mesa "should have a protocol in place" and that "[a]ll health workers should at minimum be wearing a face mask and have gloves and aprons."[7]

69.   Jessica V., a licensed vocational nurse at Villa Mesa, reported that Villa Mesa was "not providing [masks]."  She did not give her last name to the San Gabriel Valley Tribune reporter because she feared reprisal from her employer.

---

[7] Steven Scauzillo, *8 Residents, 3 Workers at Uplands Nursing Facility Contract Coronavirus*, Daily Bulletin, (April 20, 2020),  https://www.dailybulletin.com/2020/04/20/8-residents-3-workers-at-uStpland-nursing-facility-contract-coronavirus/

**COMPLAINT**                                                                                                    12

70.     Jessica, who had been very communicative with Cynthia and had taken good care of David whenever Cynthia was present, told Cynthia that she had seen a box of Personal Protective Equipment ("PPE"), but that it had disappeared shortly after the facility was shut down to visitors around March 12, 2020.

71.     The situation was so dire that by April 20, 2020, the Inland Counties Emergency Medical Agency ("ICEMA") was called upon to deliver N95 masks, over 70 gowns, and COVID-19 testing kits to VMCC.

72.     By April 24, 2020, nearly a quarter off the residents had contracted COVID-19, and three (3) of them, including David, had died from it.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### ELDER AND DEPENDENT ADULT ABUSE AND NEGLECT UNDER THE ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT

(Against All Defendants)

73.     Plaintiffs incorporate by reference and re-allege all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

74.     At all relevant times, Mr. Carrillo was an elder as defined by Welfare & Institutions Code Section 15610.27.  He was 65 years old at the time of the Defendant's conduct.

75.     The actions described above constitute abuse of an elder as defined by the Welfare and Institutions Code Section 15610.07.  Defendant VMCC neglected Mr. Carrillo, abandoned its obligations to Mr. Carrillo and engaged in other mistreatment that resulted in physical harm, pain and mental suffering.  Defendant VMCC deprived Mr. Carrillo of services that were necessary to avoid physical harm and mental suffering.  Defendant VMCC failed to provide adequate funding and staffing to ensure that VMCC provided necessary care to Mr. Carrillo.

76.     The actions described above constitute neglect as defined by the Welfare and Institutions Code Section 15610.57 in that the Defendants negligently failed to exercise a

degree of care that a reasonable person in a like position would exercise.  Among other things, Defendant failed to: (1) exercise the degree of care that a reasonable person in a like position would exercise; (2) protect Mr. Carrillo from health and safety hazards; (3) provide necessary care and protection; (4) provide medical care for physical and mental health needs; (5) prevent malnutrition and dehydration; (6) create and update an adequate plan of care to protect Mr. Carrillo given the COVID-19 outbreak at VMCC; (7) provide adequate staffing levels to provide Mr. Carrillo with the assistance that he needed; and (8) adequately train staff to assess and respond to infectious outbreaks.  As described in this Complaint, Defendant's conduct constitutes neglect of an elder under Welfare and Institutions Code Section 15610.57(a)(1) and (b)(1)-(4).

77.    Mr. Carrillo has been harmed by Defendant's conduct as described herein. The pattern of substandard care and neglect of Mr. Carrillo put him at extremely high risk for infections and resulting complications, including injury and death.  Defendant's conduct was a substantial factor in causing Mr. Carrillo to suffer physical, emotional, and economic harm, as well as other damages in an amount to be determined according to proof.

78.    Defendants acted with recklessness, malice, oppression, and/or fraud. Among other things, Defendants neglected to take the necessary precautions to prevent Mr. Carrillo's injuries.  Plaintiff, individually and as successor-in-interest to Mr. Carrillo is entitled to compensatory damages, as well as punitive damages in an amount to be determined according to proof, as well as attorneys' fees and costs pursuant to Welfare and Institutions Code Section 15657.

WHEREFORE, Plaintiff prays for the relief as set forth below.

## SECOND CAUSE OF ACTION

## NEGLIGENCE

(Against All Defendants)

79.    Plaintiff incorporates by reference and re-alleges all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

**COMPLAINT**                                                                                                14

80. By virtue of their roles as caretakers and by virtue of the fact that Mr. Carrillo was a dependent adult residing at VMCC, Defendants had a duty to exercise a degree of care that a reasonable person in a like position would exercise. Defendants failed to do so. Among other things, Defendants had a duty to:

a. Adequately staff VMCC;

b. Ensure that each worker received adequate training before working with Mr. Carrillo;

c. Provide services that meet professional standards of quality;

d. Ensure that an adequate patient care plan was developed, reviewed, revised, and carried out, including specifically, because Mr. Carrillo was exposed to COVID-19 at VMCC;

e. Take all reasonable and necessary precautions to ensure that Mr. Carrillo did not contract COVID-19;

f. Protect Mr. Carrillo from health and safety hazards;

g. Provide Mr. Carrillo with necessary tests promptly and report those results to his family promptly; and

h. Treat Mr. Carrillo with respect, dignity, and without abuse.

81. Defendant's negligence, carelessness, recklessness, and unlawfulness were a substantial factor in causing Mr. Carrillo to suffer tremendous physical, emotional, economic, and fatal harm as well as other damages to be proven at the time of the trial.

82. As a direct and legal result of the wrongful acts and omissions of Defendant and DOES 1-50, David was harmed.

83. By reason of the wrongful death of Mr. Carrillo that resulted from the wrongful acts and omissions of Defendants, Plaintiff suffered and continue to suffer loss of love, companionship, comfort, affection, solace, and moral support of Mr. Carrillo in the amount to be determined at trial.

84. By reason of the wrongful death of Mr. Carrillo, resulting from the wrongful acts and/or omissions of Defendant and DOES 1-50, and each of them, Plaintiff hereby seeks

1   recovery of other such relief as may be just, including as provided for under Civil Code Section
2   377.61.

3       WHEREFORE, Plaintiff prays for relief as set forth below.

4                               **THIRD CAUSE OF ACTION**

5                                  **WRONGFUL DEATH**

6                                 (Against All Defendants)

7       85.    Plaintiff incorporates by reference and re-alleges all of the allegations contained
8   in the preceding paragraphs of this Complaint as though fully set forth herein.

9       86.    Defendant and DOES 1-50, and each of them, negligently, carelessly, recklessly
10  and/or unlawfully operated VMCC so as to cause the death of Mr. Carrillo.

11      87.    Defendant VMCC and DOES 1-50 were agents, servants, employees, successors-
12  in-interest, and/or joint venturers of one another, and were, as such, acting within the scope,
13  and authority of said agency, employment and/or venture when they negligently, carelessly,
14  recklessly and/or unlawfully withheld necessary care from Mr. Carrillo so as to cause the death
15  of Mr. Carrillo.

16      88.    As a direct and legal result of the wrongful acts and omissions of Defendant, Mr.
17  Carrillo died.

18      89.    By reason of the wrongful death of Mr. Carrillo resulting from the wrongful acts
19  and omissions of Defendant and DOES 1-50, Plaintiff has incurred expenses, in the amount to
20  be determined at trial.

21      90.    By reason of the wrongful death of David Carrillo, resulting from the wrongful
22  acts and omissions of Defendant and DOES 1-50, and each of them, Plaintiff suffered, and
23  continues to suffer, the loss of love, companionship, comfort, affection, solace, and moral
24  support of a loved brother.

25      91.    As a direct and legal result of the aforementioned acts of Defendant VMCC and
26  DOES 1-50, inclusive, Plaintiff, by reason of the wrongful death of Mr. Carrillo, resulting from
27  the wrongful acts and/or omissions of Defendant, hereby seeks recovery of other such relief as
28  may be just and provided for under Code of Civ. Proc. Section 377.61.

---

**COMPLAINT**                                                                          16

92.     Plaintiff is informed and believes, and thereon alleges, that in the days leading up to Mr. Carrillo's death, and continuing through his death, Defendant and DOES 1-50, and each of them, at all times mentioned, were under a statutory duty to comply with all applicable laws and governing nursing homes in California, including but not limited to the following:

- Cal Health & Safety Code § 1279.6 (safety plan);
- Cal Health & Safety Code § 1337.1 (adequate training);
- Cal Health & Safety Code § 1599.1(a) (adequate and qualified staff);
- Title 22 CCR § 72311 (care plan and prompt reporting);
- Title 22 CCR § 72315 (required services);
- Title 22 CCR §§ 72329(a) & 72501(e) (adequate staffing);
- Title 22 CCR § 72517 (adequate training);
- Title 22 CCR § 72523 (adequate policies and procedures);
- Title 22 CCR § 72527(a)(11) (respect, dignity, & without abuse);
- Title 22 CCR § 72537 (reporting of communicable disease);
- Title 22 CCR § 72539 (reporting of outbreaks);
- Title 22 CCR § 72541 (reporting of unusual occurrences);

Defendant's violations of these laws and regulations were a contributing factor to the death of Mr. Carrillo.

93.     Mr. Carrillo was one off the class of persons whose protection the aforementioned laws and regulations, as well as Welfare and Institutions Code §§ 15600 *et seq.* was afforded.

94.     As a direct and legal result of the wrongful acts and omissions alleged herein of Defendants including DOES 1 though 50, and each of them, Mr. Carrillo died.

95.     By reason of wrongful death of Mr. Carrillo resulting from the wrongful acts and omissions of Defendant, and DOES 1-50, Plaintiff has incurred expenses, in an amount to be determined at trial.

**COMPLAINT**

17

96.     By reason of the wrongful death of Mr. Carrillo, resulting from the wrongful acts and omissions of Defendant and DOES 1-50, and each of them, Plaintiff suffered and continues to suffer loss of love, comfort, affection, solace and the moral support of her brother.

97.     As a direct and legal result of the aforementioned acts of Defendant VMCC and DOES 1-50, inclusive, Plaintiff, by reason of the wrongful death of Mr. Carrillo, resulting from the wrongful acts and/or omissions of Defendant, hereby seeks recovery of other such relief as may be just and provided for under Code of Civ. Proc. § 377.61.

WHEREFORE, Plaintiff prays for relief as set forth below.

**FOURTH CAUSE OF ACTION**

**VIOLATION OF CALIFORNIA HEALTH AND SAFETY CODE SECTION 1430(b)**

98.     Plaintiff incorporates by reference and re-alleges all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

99.     Defendant and DOES 1-50, and each of them, negligently, carelessly, recklessly and/or unlawfully operated VMCC so as to violate Health and Safety Code Section 1430(b) by violating, among other things:

- Cal Health & Safety Code § 1279.6 (safety plan);
- Cal Health & Safety Code § 1337.1 (adequate training);
- Cal Health & Safety Code § 1599.1(a) (adequate and qualified staff);
- Title 22 CCR § 72311 (care plan and prompt reporting);
- Title 22 CCR § 72315 (required services);
- Title 22 CCR §§ 72329(a) & 72501(e) (adequate staffing);
- Title 22 CCR § 72517 (adequate training);
- Title 22 CCR § 72523 (adequate policies and procedures);
- Title 22 CCR § 72527(a)(11) (respect, dignity, & without abuse);
- Title 22 CCR § 72537 (reporting of communicable disease);
- Title 22 CCR § 72539 (reporting of outbreaks);
- Title 22 CCR § 72541 (reporting of unusual occurrences);

---

**COMPLAINT**                                                                 18

100.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered injury and is entitled to injunctive relief preventing Defendants from continuing such conduct.

101.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered injury and is entitled to statutory damages in an amount to be determined at trial, as well as attorney's fees and costs.

## VIII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Cynthia Carrillo prays for relief as follows:

1.   Injunctive relief preventing Defendants from further mistreatment of VMCC residents;

2.   General and special compensatory damages according to proof;

3.   Punitive damages according to proof, including treble punitive damages per Civil Code Section 3345;

4.   For prejudgment and post-judgment interest upon such judgment at the maximum rate provided by law;

5.   Reasonable costs of suit;

6.   Attorneys' fees and costs per Welfare and Institutions Code Section 15657; and

7.   Such other further relief as the Court may deem proper.

### DEMAND FOR JURY TRIAL

Dated:  December 23, 2020                    **COTCHETT, PITRE & McCARTHY, LLP**


By: _____

ANNE MARIE MURPHY
CARLOS URZUA
SAMUEL GUTIN

*Attorneys for Plaintiff*

1       Plaintiffs demand trial by jury on all issues so triable.

2   Dated:  December 23, 2020        **COTCHETT, PITRE & McCARTHY, LLP**

3

4                   By: _____

5                      ANNE MARIE MURPHY
                            CARLOS URZUA

6                      SAMUEL GUTIN

7                      *Attorneys for Plaintiff*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

**COMPLAINT**                                                 20

# Exhibit A

1    ANNE MARIE MURPHY (SBN 202540)
     amurphy@cpmlegal.com
2    SAMUEL GUTIN (SBN 324436)
     sgutin@cpmlegal.com
3    **COTCHETT, PITRE & McCARTHY, LLP**
     840 Malcolm Road
4    Burlingame, California 94010
     Telephone: (650) 697-6000
5
6    CARLOS URZUA (SBN 303176)
     curzua@cpmlegal.com
7    **COTCHETT, PITRE & McCARTHY, LLP**
     2716 Ocean Park Blvd Suite 3088
8    Santa Monica, CA 90405
     Telephone: (310) 392-2008
9
10   *Attorneys for Plaintiff*
11
                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
12                 **IN AND FOR THE COUNTY OF SAN BERNADINO**
13

14   **CYNTHIA CARRILLO,** individually and as     | Case No.
     heir of **DAVID CARRILLO,** deceased,
15                                                 | **DECLARATION OF PLAINTIFF**
16                     Plaintiff,                   | **CYNTHIA CARRILLO AS SUCCESSOR-**
                                                   | **IN-INTEREST PURSUANT TO**
17         v.                                      | **CALIFORNIA CODE OF CIVIL**
                                                   | **PROCEDURE § 377.32**
18   **VILLA MESA CARE CENTER,**
     a/k/a **San Antonio Post Acute Facility;**
19
20   **DOES 1-50**.
21                     Defendants.
22
23
24
25
26
27
28
     ────────────────────────────────────────────
     **DECLARATION OF PLAINTIFF CYNTHIA CARRILLO AS SUCCESSOR-IN-**
     **INTEREST PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 377.32**

1       I, Cynthia Carrillo, hereby declare as follows:

2       1.      I am over 18 years of age. I make this declaration based on facts within my own

3   personal knowledge and if called as a witness, I could and would competently testify thereto.

4       2.      I am the sister of David Carrillo, who died on April 17, 2020, in Upland,

5   California. A Certified copy of David Carrillo's death certificate is attached hereto as Exhibit

6   A.

7       3.      This declaration is made pursuant to California Code of Civil Procedure §

8   377.32.

9       4.      I, as successor-in-interest to David Carrillo, deceased, bring this survivorship

10  action pursuant to § 377.30 *et seq.* of the California Code of Civil Procedure on behalf of the

11  Estate of David Carrillo.

12      5.      No proceeding is now pending in the State of California for administration of the

13  Estate of David Carrillo.

14      6.      I am one of the successors-in-interest to David Carrillo as defined in Section

15  377.11 of the California Code of Civil Procedure and succeed to his interest in the above-

16  entitled proceeding.

17      7.      No other person has a superior right to commence the action or proceeding or to

18  be substituted for David Carrillo in the pending action or proceeding.

19      I declare under penalty of perjury under the laws of the State of California that the

20  foregoing is true and correct.

21      Executed this 23rd day of December, 2020, at Rancho Cucamonga, California.

22

23      _____

24      CYNTHIA CARILLO

25

26

27

28

**DECLARATION OF PLAINTIFF CYNTHIA CARRILLO AS SUCCESSOR-IN-INTEREST PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 377.32**

1

# Exhibit A

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY of SAN BERNARDINO
### DEPARTMENT OF PUBLIC HEALTH
### 351 N. MT. VIEW AVENUE, SAN BERNARDINO, CALIFORNIA 92415-0010

**CERTIFICATE OF DEATH**

STATE OF CALIFORNIA
USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS
VS-11 (REV. 3/08)

STATE FILE NUMBER — 3202036004882 — LOCAL REGISTRATION NUMBER

**DECEDENT'S PERSONAL DATA**

| Field | Value |
|---|---|
| 1. NAME OF DECEDENT—FIRST (Given) | DAVID |
| 2. MIDDLE | BENJAMIN |
| 3. LAST (Family) | CARRILLO |
| AKA, ALSO KNOWN AS—Include full AKA (FIRST, MIDDLE, LAST) | |
| 4. DATE OF BIRTH mm/dd/ccyy | 06/07/1954 |
| 5. AGE Yrs. | 65 |
| IF UNDER ONE YEAR Months / Days | |
| IF UNDER 24 HOURS Hours / Minutes | |
| 6. SEX | M |
| 7. BIRTH STATE/FOREIGN COUNTRY | CA |
| 10. SOCIAL SECURITY NUMBER | 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 |
| 11. EVER IN U.S. ARMED FORCES? | YES [X] NO UNK |
| 12. MARITAL STATUS/SRDP at Time of Death | NEVER MARRIED |
| 7. DATE OF DEATH mm/dd/ccyy | 04/17/2020 |
| 8. HOUR (24 Hours) | 1026 |
| 9. EDUCATION—Highest Level/Degree (See worksheet on back) | HS GRADUATE |
| 14/15. WAS DECEDENT HISPANIC/LATINO/A/SPANISH? (If yes, see worksheet on back) | [X] YES MEXICAN AMERICAN NO |
| 16. DECEDENT'S RACE—Up to 3 races may be listed (see worksheet on back) | MEXICAN AMERICAN |
| 17. USUAL OCCUPATION—Type of work for most of life. DO NOT LEAVE BLANK | NEVER WORKED |
| 18. KIND OF BUSINESS OR INDUSTRY (e.g., grocery store, road construction, employment agency, etc.) | - |
| 19. YEARS IN OCCUPATION | - |

**USUAL RESIDENCE**

| Field | Value |
|---|---|
| 20. DECEDENT'S RESIDENCE (Street and number, or location) | 2331 HELEN AVENUE |
| 21. CITY | UPLAND |
| 22. COUNTY/PROVINCE | SAN BERNARDINO |
| 23. ZIP CODE | 91766 |
| 24. YEARS IN COUNTY | 3 |
| 25. STATE/FOREIGN COUNTRY | CA |

**INFORMANT**

| Field | Value |
|---|---|
| 26. INFORMANT'S NAME, RELATIONSHIP | CYNTHIA CARRILLO, SISTER |
| 27. INFORMANT'S MAILING ADDRESS (Street and number, or rural route number, city or town, state and zip) | 2331 HELEN AVENUE, UPLAND, CA 91766 |

**SPOUSE/SRDP AND PARENT INFORMATION**

| Field | Value |
|---|---|
| 28. NAME OF SURVIVING SPOUSE/SRDP—FIRST | |
| 29. MIDDLE | |
| 30. LAST (BIRTH NAME) | |
| 31. NAME OF FATHER/PARENT—FIRST | BENJAMIN |
| 32. MIDDLE | |
| 33. LAST | CARRILLO |
| 34. BIRTH STATE | CA |
| 35. NAME OF MOTHER/PARENT—FIRST | ROSE |
| 36. MIDDLE | |
| 37. LAST (BIRTH NAME) | LEYVA |
| 38. BIRTH STATE | CA |

**FUNERAL DIRECTOR/LOCAL REGISTRAR**

| Field | Value |
|---|---|
| 39. DISPOSITION mm/dd/ccyy | 04/29/2020 |
| 40. PLACE OF FINAL DISPOSITION | RES CYNTHIA CARRILLO 2331 HELEN AVENUE, UPLAND, CA 91766 |
| 41. TYPE OF DISPOSITION(S) | CR/RES |
| 42. SIGNATURE OF EMBALMER | NOT EMBALMED |
| 43. LICENSE NUMBER | |
| 44. NAME OF FUNERAL ESTABLISHMENT | TRADITION CREMATION CENTER |
| 45. LICENSE NUMBER | FD2127 |
| 46. SIGNATURE OF LOCAL REGISTRAR | ERIN GUSTAFSON, MD, MPH |
| 47. DATE mm/dd/ccyy | 04/29/2020 |

**PLACE OF DEATH**

| Field | Value |
|---|---|
| 101. PLACE OF DEATH | SAN ANTONIO REGIONAL HOSPITAL |
| 102. IF HOSPITAL, SPECIFY ONE | [X] IP ER/OP DOA |
| 103. IF OTHER THAN HOSPITAL, SPECIFY ONE | Hospice / Nursing Home/LTC / Decedent's Home / Other |
| 104. COUNTY | SAN BERNARDINO |
| 105. FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number, or location) | 999 SAN BERNARDINO RD |
| 106. CITY | UPLAND |

**CAUSE OF DEATH**

| | Cause | Time Interval Between Onset and Death | |
|---|---|---|---|
| 107. CAUSE OF DEATH | | | 108. DEATH REPORTED TO CORONER? [X] YES NO |
| IMMEDIATE CAUSE (A) | ACUTE RESPIRATORY FAILURE | DAYS | REFERRAL NUMBER 702003033 |
| Sequentially list conditions (B) | VIRAL AND BACTERIAL PNEUMONIA | DAYS | 109. BIOPSY PERFORMED? YES [X] NO |
| (C) | COVID-19 | DAYS | 110. AUTOPSY PERFORMED? YES [X] NO |
| (D) | | | 111. USED IN DETERMINING CAUSE? |
| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 | DOWN'S SYNDROME | | |
| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (If yes, list type of operation and date.) | NO | | 113A. IF FEMALE, PREGNANT IN LAST YEAR? YES NO UNK |

**PHYSICIAN'S CERTIFICATION**

| Field | Value |
|---|---|
| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. | |
| Decedent Attended Since | 04/09/2020 |
| Decedent Last Seen Alive | 04/17/2020 |
| 115. SIGNATURE AND TITLE OF CERTIFIER | ZOUHAIR HAKAK M.D. |
| 116. LICENSE NUMBER | C51024 |
| 117. DATE mm/dd/ccyy | 04/29/2020 |
| 118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | ZOUHAIR HAKAK M.D. 1330 W COVINA BLVD STE 206, SAN DIMAS, CA 91773 |

**CORONER'S USE ONLY**

| Field | Value |
|---|---|
| 119. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. | |
| 120. MANNER OF DEATH | Natural / Accident / Homicide / Suicide / Pending Investigation / Could not be determined |
| 120. INJURED AT WORK? | |
| 121. INJURY DATE mm/dd/ccyy | |
| 122. HOUR (24 Hours) | |
| 123. PLACE OF INJURY (e.g., home, construction site, wooded area, etc.) | |
| 124. DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) | |
| 125. LOCATION OF INJURY (Street and number, or location, and city and zip) | |
| 126. SIGNATURE OF CORONER / DEPUTY CORONER | |
| 127. DATE mm/dd/ccyy | |
| 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER | |

| STATE REGISTRAR | A | B | C | D | E | | FAX AUTH.# | CENSUS TRACT |
|---|---|---|---|---|---|---|---|---|

*000100452081*

---

### CERTIFIED COPY OF VITAL RECORD

STATE OF CALIFORNIA
COUNTY OF SAN BERNARDINO } SS   DATE ISSUED

This is a true and exact reproduction of the document officially registered and placed on file in the VITAL RECORDS SECTION, SAN BERNARDINO DEPARTMENT OF PUBLIC HEALTH.

MAXWELL OHIKHUARE, M.D.
COUNTY HEALTH OFFICER
REGISTRAR OF VITAL STATISTICS

MAY 0 5 2020

*002808071*

This copy not valid unless prepared on engraved border displaying the date, seal and signature of Registrar.
PHSO (Rev 06/17)

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

